UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAUL W. DRIGGERS, DJD, CMD, and MKD,<br><br>              Plaintiffs,<br><br>   v.<br><br>DAVID BECK, CHRISTINA McNUTT, ROBIN JACOBSEN, AMANDA GRAFE, DENISE METZGER, KATHY CRAWFORD, PAT KENNER, , JOHN DOES I and III, POST FALLS IDAHO POLICE DEPARTMENT, IDAHO DEPARTMENT OF HEALTH AND WELFARE, CHERYL BUCKNER, and GLENDA FELTS,<br><br>              Defendants. | Case No. 1:10-cv-00182-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

In this case, Plaintiff Paul Driggers alleges that Idaho Department of Health and Welfare Child Protective Services employees and Post Falls City Police Department employees were involved in a conspiracy against him to take his children and property, violating various federal statutes, including the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962. Pending before the Court is a Motion to Dismiss Plaintiff's First Amendment Complaint, filed by the Idaho Department of Health and Welfare (IDHW) Defendants Christina McNutt, Robin Jacobson, Amanda Grafe,

**MEMORANDUM DECISION AND ORDER - 1**

Denise Metzger, Kathy Crawford, Cherly Buckner[1] and Glenda Felts (collectively "IDHW Defendants") (Dkt. 31), and several motions filed by Plaintiff. (Dkt. 33, 36, 37.)

Having reviewed the record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, in the interest of avoiding delay, the Court shall decide the motion on the written briefs and record without oral argument. D. Idaho L. Civ. R. 7.1(d).

As to the Defendants who have not appeared, the Court also reviews the First Amended Complaint to determine whether Plaintiff can proceed on his claims against them, pursuant to the screening requirement for prisoner and in forma pauperis complaints found in 28 U.S.C. §§ 1915 and 1915A.

Accordingly, the Court enters the following Order granting the Motion to Dismiss and dismissing the entire First Amendment Complaint.

## BACKGROUND

This is the fifth civil case Plaintiff has filed in federal court that is related to his child custody affairs; in addition, a sixth related criminal case was filed by the United States against Plaintiff. All related cases include the following: Plaintiff's federal criminal case (Case No. 2:06-cr-173-EJL, *U.S. v. Driggers*); a § 2255 motion challenging his

---

[1]Cherly Buckner's name is spelled "Cheryl" by Plaintiff elsewhere in the record.

**MEMORANDUM DECISION AND ORDER - 2**

sentence (Case No. 2:06-cr-00173-EJL, *Driggers v. USA*);[2] a first civil rights action that was dismissed by Chief United States Judge B. Lynn Winmill (Case No. 2:08-cv-00116-BLW, *Driggers v. Idaho Health and Welfare, David Beck, et al.*); a second civil rights action that was dismissed by this Court (Case No. 1:11-cv-00137-EJL, *Driggers v. Simpson, et al.*);[3] and a third civil rights action challenging the manner in which the filing fee for one of the civil rights actions was being deducted from his prison trust account (Case No. 1:11-cv-00547-EJL, *Driggers v. United States Bureau of Prisons*). Plaintiff has also filed various state court civil actions addressing his child custody affairs.

To determine whether a complaint states a claim upon which relief can be granted, the Court generally may not consider materials outside the complaint and pleadings. *See Cooper v. Pickett*, 137 F.3d 616, 622 (9th Cir. 1997). However, the Court may consider attachments to the complaint and documents referred to in the complaint though not attached to it, where authenticity is not in question. *Hal Roach Studios*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990); *Townsend v. Columbia Operations*, 667 F.2d 844, 848-49 (9th Cir. 1982). In addition, when a court is considering a motion to dismiss, it may take judicial notice of matters of public record, such as state and federal court proceedings and doing so does not convert a motion for summary dismissal into a motion for summary

---

[2] Petitioner's § 2255 motion was denied by the Court, and the United States Court of Appeals for the Ninth Circuit denied a certificate of appealability.

[3] Plaintiff alleged that Department of Health and Welfare Child Protective Services (CSP) employees, Court personnel, and law enforcement officers conspired to violate his civil rights regarding the handling of the custody and visitation matters involving his children during the time period preceding his indictment and arrest.

**MEMORANDUM DECISION AND ORDER - 3**

judgment. *Mack v. South Bay Beer Distributors*, 798 F.2d 1279, 1281 (9th Cir. 1986); Fed. R. Evid. 201(b); *Dawson v Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006).[4]

Consistent with the law governing motions to dismiss and the screening provisions for in forma pauperis complaints found in Title 28, the Court relies on the following factual allegations that are found in Plaintiff's filings, including his exhibits.

Plaintiff and Karen Vassallo have three minor daughters. Prior to moving to Idaho, the family lived in Arizona. After arriving in Idaho, Plaintiff and Vassallo divorced in September 2004, and Plaintiff was awarded full custody of the children. (First Amended Complaint, Dkt. 3, pp. 2-3.) Vassallo and Plaintiff lived together in Plaintiff's residence after their divorce. (*Id*.)

On or about November 18, 2005, it was discovered at school that the oldest daughter, D.D., then six or seven years old, had several large bruises on her body. (Dkt. 23-2, pp. 12-13.) At some point in time, D.D. reported that Plaintiff used a belt for discipline at home. Defendant Officer David Beck, the assigned officer for Child Protective Services (CPS) work, investigated D.D.'s statements, prepared a police report, and reported the incident to IDHW CPS case worker Defendant Amanda Grafe. (*Id*.; Dkt. 3, p. 4, in Case No. 2:08-cv-00116-BLW.)

Officer Beck reported that he went to D.D.'s school and took photographs of the marks the belt had left on D.D.'s face, upper chest and neck area, and lower left side. The

---

[4]*abrogated on other grounds by Astoria Federal Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166 (1991).

**MEMORANDUM DECISION AND ORDER - 4**

officer interviewed the child on audiotape and decided to remove her temporarily from the home and place her in a shelter at that time. (Dkt. 23-2, p. 12-13.) Officer Beck issued Plaintiff a citation for I.C. § 18-1501, injury to child, and gave him a "Notice of State Action and Shelter Care Hearing." (*Id.*, p. 13.) On November 18, 2005, Post Falls City Police Officer David Beck took Plaintiff's three children, as well as Vassallo's minor son, from the parents' custody and placed them in temporary shelter housing. (Dkt. 23, p. 5.)

The police report notes that D.D. said her father called the belt "the devil belt." (Dkt. 23, p. 12.) A CPS Report notes: "D.D. confronted her father at her first visit [after being removed from the parents' home]. Telling him he cannot hit her with a belt anymore, it is not safe. She cried and he held her." (Dkt. 23-3, p. 25.) However, Plaintiff alleges that it was Vassallo who injured D.D. and sent her to school with bruises so that Plaintiff would be blamed, and that Vassallo and Defendants prompted the child to make up the story about Plaintiff hitting her with a belt. (Dkt. 3, p. 11, Case No. 2:08-cv-00116-BLW.)

On December 11, 2005, Defendant Christina McNutt, an IDHW CPS employee, prepared a "Risk Assessment: Intake Summary and Comprehensive Risk Assessment" (Risk Assessment Report) regarding D.D. As part of the investigation, McNutt spoke to Mary Martinez, an Arizona CPS worker, who reported that, while in Arizona, the Driggers family had had eight referrals to CPS. Martinez reported to McNutt that, in 1999, the issues were neglect-based, due to home conditions and mental conditions of the mother. CPS services ended in 2004 after the family's house burned down, and CPS could no

**MEMORANDUM DECISION AND ORDER - 5**

longer locate the family. (Dkt. 23-3, p. 24.) CPS reports from 2003-2004 show allegations of neglect and abuse of the children by the mother and allegations of domestic violence between the parents. (Dkt. 23-3, pp. 19-23.)

The Idaho Risk Assessment Report prepared by McNutt indicated that, in Arizona, in 2004, there were allegations that Plaintiff had physically abused Vassallo's son by grabbing him by the hair and banging his head on an object. McNutt reported in the Risk Assessment Report that Plaintiff "has a history of mental illness and [is] known to be violent and [has] given threats to previous CPS workers." (Dkt. 23-3, p. 24.)

Plaintiff alleges that, on January 6, 2006, Vassallo planted a stolen handgun in the bottom of a laundry basket in Plaintiff's house, met with police officers and falsely claimed Plaintiff had threatened her with a gun, and consented to a search of the house. Plaintiff was arrested after officers found the gun, but the charges were dismissed for lack of probable cause. (Dkt. 3, p. 12, Case No. 2:08-cv-00116-BLW.)

In or about February 2006, Plaintiff and Vassallo ceased living together. On February or March 6, 2006, Vassallo took personal property items from Plaintiff's home. (Dkt. 23, p. 5.) Defendant Pat Kenner of the Post Falls Police Department filed a police report regarding the loss of property. (*Id*.) Plaintiff takes issue with the fact that officers designated the matter a civil matter and refused to file criminal charges against Vassallo; he alleges that officers did this to deflect litigation away from themselves, because Plaintiff believes the officers were responsible for protecting his house and possessions. (*Id*., pp. 5-6.)

**MEMORANDUM DECISION AND ORDER - 6**

Plaintiff alleges that, on or about March 6, 2006, Vassallo contacted the FBI, made accusations about Plaintiff being involved in various illegal activities, and gave the FBI all of his paperwork and computer. (Dkt. 135 in Case No. 2:06-cr-00173-EJL.)

Plaintiff alleges that, on March 26, 2006, Officer Kenner spoke to Plaintiff's insurance company, telling the company it was impossible to establish that Plaintiff was the owner of the personal property Vassallo had taken; thus, the insurance company denied Plaintiff's claim. (Dkt. 23, p. 5.) In April of 2006, Plaintiff filed a lawsuit in state court and obtained a judgment against Vassallo for property she had taken from him. (*Id.*, p. 5.)

While in foster care, the oldest child, D.D. reported that Plaintiff had inappropriate bodily contact with her.[5] (Dkt. 23-2, p. 17, 32.) D.D.'s two sisters also reported similar bodily contact. While in CPS custody, all three children reported to their separate therapists that they were afraid of their parents. (Dkt. 23-2, p. 30.) Officer Beck further investigated the bodily contact allegations. (*Id.*, p. 17.)

---

[5] The CPS Report states:

> While in foster care, the Driggers girls brought forth concerns that their father has inappropriately touched them. A new investigation and forensic interview found that D.D. has disclosed that her father had inappropriately touched her vagina area in her bedroom. All three of the girls report that their father would "give them titty twisters." Finally, all three girls report that they shower naked with their father, and that he is naked as well. D.D. reports that her father would wash his privates with soap and then put it on her face. This is very concerning in regard to age appropriate care for the girls.

(Dkt. 23-3, p. 32.)

**MEMORANDUM DECISION AND ORDER - 7**

On May 11, 2006, Defendant Amanda Grafe, a CPS case manager, drew up a plan for Plaintiff and Vassallo to work toward regaining custody of their children. The plan required Plaintiff to learn more appropriate disciplining techniques. (Dkt. 23-3, p. 32.) Plaintiff reported to Grafe that he thought Vassallo had planted the physical abuse allegations in the children's minds, but Grafe reported "substantiated investigations have shown that he did abuse D.D. by hitting her multiple times over her body with a belt." (Dkt. 23-3, at p. 31.)

On May 23, 2006, the following report on D.D.'s progress was recorded in a "Social Work for Sexual Abuse Medical Evaluation." (Dkt. 23-2, p. 15.)

> History is provided today by child's foster mother. . . . Foster mother reports that this child and her younger sisters, 5 and 4, were placed into care in approximately November of 2005. The children were placed at Children's Village, then subsequently in another foster home. The second placement only lasted several weeks due to the children's extreme behavior and the foster family being able to provide care further. Foster mother was aware that there had likely been sexual abuse of this child prior to her being placed within the home. Foster mother has noted some inappropriate sexualized statements from the child but no sexualized acting out. When this child and her siblings arrived they did not seem to know how to bathe or feed themselves, in fact, they ate off the floor. They had very poor socialization skills and were excessively violent with each other. Also of note this child had a history of being beaten on both the front and back parts of her body with a belt. That also factored into her removal by CPS. Foster mother's opinion is that these children have all been physically abused due to the fact that whenever the foster parents inadvertently make a quick movement or drop something like a glass in the house, the children will cringe and scatter across the floor. This is particularly notable for this 7-year-old child.

(Dkt. 23-2, p. 15.)

**MEMORANDUM DECISION AND ORDER - 8**

On June 23, 2006, Officer Beck sent a copy of the report of the sexual misconduct alleged by D.D. to the Kootenai County Prosecutor's Office requesting a complaint and a warrant for Plaintiff for one count of lewd conduct with a minor child under the age of 16 years. (Dkt. 23-2, p. 18.) The prosecutor declined to charge Plaintiff with lewd conduct. On or about July 3, 2006, Plaintiff entered a guilty plea to disturbing the peace, arising from the belt incident with D.D. This was a reduction from the initial charge of injury to child. (Dkt. 24-2, p. 20, in Case No. 2:09-cv-00468-EJL.)

On August 8, 2006, in *United States v. Driggers*, a grand jury indicted Plaintiff for Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire, regarding Plaintiff's involvement in a conspiracy to murder Vassallo, an alleged violation of 18 U.S.C. § 1958. (*Indictment* in *U.S. v. Driggers*, CV06-173-N-EJL, Dkt. 1).

On February 23, 2007, a jury convicted Plaintiff of the criminal charge. (*Id.*, Jury Verdict, Dkt. 113). Plaintiff was sentenced to ten years of imprisonment, and is currently incarcerated in an out-of-state federal detention center.

In 2007, IDHW lawyers filed a first petition for termination of Plaintiff's parental rights, based on the federal criminal conviction, although they termed it "solicitation to commit murder" instead of "use of interstate facilities in commission of murder-for-hire." That petition was dismissed by a Kootenai County Magistrate Judge. (Dkt. 3, p. 20, Case No. 2:08-cv-00116-BLW.)

**MEMORANDUM DECISION AND ORDER - 9**

In May 2008, IDHW lawyers filed a second petition for termination of Plaintiff's parental rights. It is unclear what happened in that case, but Plaintiff's parental rights have not been terminated to date.

On July 8, 2008, Kootenai County Magistrate Judge Simpson held a hearing in Plaintiff's state child custody matter, on a pending motion for modification of custody filed by Vassallo. At the hearing, Magistrate Simpson informed Plaintiff of the following:

1.  If the children remained out of the custody of either parent for 15 of the next 22 months, the State would be required to pursue permanency proceedings, which would include termination of parental rights of both parents.

2.  Because the Department of Health and Welfare has a duty to undertake all reasonable efforts to reunify families, it would pursue reunification of Ms. Vassallo and her children (and it would not pursue reunification with Plaintiff because of his incarceration), and, if Ms. Vassallo complied with that plan, then she would be awarded custody of the children.

(Dkt. 3-1, pp. 8-9, in Case No. 1:11-cv-00137-EJL.)

Based on these factors, Judge Simpson asked Plaintiff to choose between two options: (1) "You can agree that [Ms. Vassallo] can have custody until such time as you get out of federal custody. . . and then you may reopen, based on the fact that you've been released from prison"; or (2) the court could set the custody case for trial. (*Id*., pp. 9-10.)

Plaintiff considered the options and stipulated to the first option. (*Id.*) Plaintiff asked if he could have contact with his children under this option. (*Id*., p. 11.) Judge Simpson said that Plaintiff could forward letters to the Department of Health and Welfare case worker, who could review the letters for suitable contents, and then the letters could be forwarded to Ms. Vassallo for distribution to the children. (*Id.*, p. 11-13.)

**MEMORANDUM DECISION AND ORDER - 10**

On July 8, 2008, Judge Simpson issued an order based on the oral stipulation. (*Id*., pp. 16-18.) The "Order Based on Stipulation" was drafted by Vassallo's attorney. The Order was submitted on July 8, 2008, the date of the hearing at which the stipulation was reached, and it was signed by Judge Simpson on the same day. The pertinent parts of that order are as follows:

> The Respondent agreed, and the parties stipulated that the Petitioner, Karen Vassallo, would have sole legal and physical custody of their minor children until such time that he is released from federal custody. Thereafter, Respondent may petition the Court for such other and additional relief as may be warranted by the circumstances.
>
> * * *
>
> The Respondent, Paul Driggers, may have contact with the minor children through written correspondence, addressed to them in care of the Idaho Department of Health and Welfare, Sandpoint Office, 207 Larkspur, Ponderay, Idaho, 83852, to the attention of the caseworker, currently, Cheryl Buckner, Ms. Buckner or the assigned caseworker, will review the correspondence for appropriate content, then forward it to Karen Vassallo for distribution to the children. The children may contact Paul Driggers, by writing to him, with proper postage affixed, in care of the caseworker, who will forward the correspondence to the facility where Respondent is in custody.

(Dkt. 3-1, pp. 16-17.)

On November 18, 2008, Judge Simpson held a telephonic hearing in Plaintiff's child custody case on Plaintiff's "motion to clarify, correct or order mediation." (Dkt. 23-3, p. 11-12.) Judge Simpson agreed with Plaintiff's position that the stipulated order permitted him the right to maintain a relationship with his children through written correspondence. (*Id*., p. 14.) Plaintiff informed the court that it had been four and a half months, and he had not been allowed to have contact with his children. Plaintiff asked for

**MEMORANDUM DECISION AND ORDER - 11**

the court to clarify the court's intention on this point. (*Id*.) Vassallo said that she did not want Plaintiff corresponding with the children. (*Id*.) Judge Simpson clarified:

> There is a court order in place that says that you're to be able to correspond through your children – with your children by forwarding correspondence to Health and Welfare. And that Health and Welfare will review that documentation. And if it seems appropriate, they will deliver it to Ms. Vassallo.
>
> Ms. Vassallo is subject to the jurisdiction of the Court and there has been an order entered that she transmit those communications.

(*Id.*, pp. 16-17.)

Notwithstanding the order permitting correspondence, on February 9, 2009, after Petitioner had sent letters and pictures to the Department of Health and Welfare to be delivered to his children, Glenda Felts, a DHW CPS supervisor, wrote to Mr. Driggers: "Please consult your attorney re: IDHW being the recipient of such articles–they are not US mail. The case is closed and therefore, any court orders pertaining to said case are/have been satisfied." (Dkt. 23-3, p. 9.) The record does not reflect whether Ms. Felts personally knew about the order in Plaintiff's case, as the court order addressed caseworker Defendant Cherly Buckner, or "the assigned caseworker."

In 2010, even though Plaintiff was still incarcerated, Plaintiff's extended family hired a lawyer for him, Monica Brennan, to pursue "a petition for modification of the custody and visitation, and for discovery, with a motion for contact with the children." (Dkt. 3, p. 8, in Case No. 1:11-cv-00137-EJL.) Plaintiff alleged that the new magistrate judge assigned to his case, Judge Clark Peterson, refused to permit Plaintiff to appear

telephonically, called Plaintiff "a type of terrorist for filing papers in Court," and threatened to impose additional sanctions if more papers were filed. (*Id*. p. 9.) It is unknown whether Plaintiff filed anything further or filed an appeal.

Plaintiff filed this action on April 5, 2010, alleging that Post Falls police officers and IDHW CPS workers violated the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962, and committed other unlawful acts.

## MOTION TO DISMISS

Defendants Christina McNutt, Robin Jacobson, Amanda Grafe, Denise Metzger, Kathy Crawford, Cherly Buckner and Glenda Felts (collectively "IDHW Defendants") seek dismissal of Plaintiff's entire complaint.

To state a claim upon which a plaintiff can proceed, Federal Rule of Civil Procedure 8(a)(2) requires " a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint challenged by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his entitle[ment] to relief" requires more than labels and conclusions. *Id*. (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")). In other words, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

**MEMORANDUM DECISION AND ORDER - 13**

(2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id*. Dismissal may be based either on the lack of cognizable legal theories or the lack of pleading sufficient facts to support cognizable legal theories. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

## 1.    RICO

Plaintiff alleges that Defendants McNutt, Jacobson, Grafe, Metzger, Crawford, Buckner, Felts, and the other Defendants acted together to violate RICO. District courts have jurisdiction over RICO claims pursuant to 18 U.S.C. § 1963. RICO provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). A finding of liability under § 1962(c) requires "(1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). A pattern of racketeering requires proof of two or more predicate acts of racketeering that are related and that are in furtherance of a single criminal scheme. *Id.* at 193. A list of racketeering acts upon which a RICO action must be based is set forth in 18 U.S.C. § 1961.

**MEMORANDUM DECISION AND ORDER - 14**

Defendants argue that Plaintiff has failed to allege sufficient facts showing that Defendants operated an enterprise or that they engaged in predicate acts in furtherance of a single criminal scheme. The Court will review each of the these arguments, in turn.

**A.**     *Enterprise*

Defendants argue that Plaintiff has failed to sufficiently allege the existence of a RICO "enterprise." A RICO enterprise can be a legitimate or illegitimate enterprise. *U.S. v. Turkette*, 452 U.S. 576, 585 (1981). Plaintiff first argues that the Post Falls Police Department and the IDHW CPS Unit are legitimate enterprises through which Defendants perpetrated their crimes upon him. Such a theory is viable so long as Plaintiff has sufficiently alleged that Defendants perpetrated crimes that qualify as predicate acts under the RICO statute. *See U.S. v. Clark*, 646 F.2d 1259, 1263 (8th Cir. 1981) (a governmental agency can qualify as a RICO enterprise, such as where a county judge accepted bribes).

Plaintiff's alternative enterprise argument is that all Defendants were engaged in a widespread conspiracy to vest custody of his children in Vassallo and to protect Vassallo, amounting to an illegitimate enterprise. The next question, then, is whether Plaintiff has alleged sufficient facts that an illegitimate enterprise actually existed and whether Plaintiff's allegations of the illegitimate enterprise are plausible.

Under this theory, Plaintiff must allege facts demonstrating that Defendants formed or acted as a group, which is sometimes called an "association-in-fact" enterprise. *See River City Markets v. Fleming Foods West*, 960 F.2d 1458, 1461-62 (9th Cir. 1992). The Supreme Court has made it clear that "allegations of parallel business conduct, taken

**MEMORANDUM DECISION AND ORDER - 15**

alone, do not state a claim of conspiracy." *Twombly*, 550 U.S. at 552. Rather, a plaintiff

"must allege additional facts that tend to exclude independent self-interested conduct as an

explanation for defendants' parallel behavior." (*Id*. at 552 (citation omitted).) Under

*Twombly*, a claim that rests upon parallel conduct, rather than "any independent allegation

of actual agreement," falls short of stating a claim for purposes of a motion to dismiss. *Id*.

at 546.

Plaintiff's argument is that the "common thread in all this is Vassallo, who is seen

communicating her desires (and alleged fears) to each Defendant along the way and the

Defendants agreeing with her, this agreement visible by their words and actions consistent

with Vassallo's desires and interest and against Plaintiff." (Dkt. 23, pp. 11-12.) Plaintiff

alleges that each Defendant had knowledge of their previous colleague's actions by

reviewing the case file. (*Id*., p. 12.)

These allegations, as well as the totality of allegations in the First Amended

Complaint, are insufficient to show that the parties were working together in an illicit

enterprise, an association-in-fact enterprise, a conspiracy, or by agreement. Rather, the

record reflects that each Defendant was performing the work each was assigned to do by

the respective employers. The police officers were investigating allegations of child

physical and sexual abuse, interviewing the victim, collecting evidence, coordinating with

the IDHW CPS unit (because it was necessary to do so in order to place the child in the

State's custody), and recommending criminal charges to the prosecutor's office. The CPS

workers were investigating child neglect and physical and sexual abuse; interviewing

**MEMORANDUM DECISION AND ORDER - 16**

family members; investigating the family's circumstances; interviewing CPS workers in

Arizona (where the family had previously lived); coordinating with local law enforcement

officers and with CPS supervisors; making decisions for the children's welfare based on

the evidence they had; communicating with the parents, foster parents, and children;

testifying and participating in related court cases (including custody and termination

cases); and creating parental improvement plans aimed toward reunification. Plaintiff's

exhibits attached to his pleadings show nothing more than imperfect human beings making

difficult decisions in the course of their employment with the City and the State.

Plaintiff has pointed to a few instances of Defendants coordinating their efforts so

that each could do their separate jobs regarding the minor children, but there are no

plausible facts alleging an agreement existed between two Defendants or among all

Defendants, the object of which was to commit a crime. For example, Officer Beck spoke

with CPS caseworker Amanda Grafe, about the children as he performed his investigatory

police work. Grafe spoke to and coordinated with other CPS Defendants to perform her

case work assignments.

The motive that Plaintiff attributes to Defendants as the object of their conspiracy is

not plausible–to ensure that Vassallo retained custody of the children–because Plaintiff's

court records show that termination proceedings would have terminated *both* parents'

rights. (Dkt. 3-1, pp. 8-9, in Case No. 1:11-cv-00137-EJL.) In addition, Plaintiff admitted

that Vassallo was minimally competent to have custody of the children while he was in

prison, an allegation that cuts against his theory that Defendants' motive–to place the

**MEMORANDUM DECISION AND ORDER - 17**

children with Vassallo–was unlawful. (*Id.*)

While Plaintiff alleges that, together, Defendants falsified allegations of child physical abuse, child sexual abuse, and the presence of a gun in Plaintiff's household, these allegations are implausible in the context of all of the exhibits Plaintiff has provided, showing that each of the three children reported that she was fearful of their parents independently to different therapists, D.D. reported the sexual abuse to third parties, photographs of D.D.'s belt injuries existed, the children's foster mother corroborated the children's reports of abuse and the overall poor condition of the children when placed into custody, and the Arizona CPS worker reported a history of neglect and abuse of the children by Plaintiff and Vassallo.

In summary, while Defendants were employed by legitimate enterprises, Plaintiff has failed to bring forward plausible allegations that Defendants were engaged in a crime perpetrated through a legitimate enterprise or that they had an agreement that amounted to a conspiracy or illicit enterprise. Rather, the allegations of conspiracy and fraud are vague, unsupported, and implausible under the circumstances shown in the exhibits attached to the First Amendment Complaint and those documents from Plaintiff's other legal actions, of which the Court takes judicial notice. It is clear that Defendants were attempting to protect the minor children (and, later, Vassallo, as the target of the murder-for-hire plot) on behalf of the City and State to the extent of their legitimate authority. That Defendants' acts or omissions may have involved negligence or poor judgment is not at issue under RICO.

**MEMORANDUM DECISION AND ORDER - 18**

B.     *Pattern of Racketeering Activity*

Defendants next argue that Plaintiff has failed to show a "pattern of racketeering activity." In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), the Supreme Court held that, to show a pattern, a litigant must have facts showing both relatedness and continuity. Particularly, a plaintiff must "show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id*. at 239.

Plaintiff's allegations fail to show that Defendants engaged in predicate acts of racketeering required to state a RICO violation. Racketeering activity is any act indictable as a crime under certain provisions of Title 18 of the United States Code. 18 U.S.C. § 1961(1)(B).

Plaintiff contends that Defendants committed the predicate acts of mail and wire fraud (18 U.S.C. § 1341), which are among the predicate acts listed under RICO. The elements of mail or wire fraud are (1) a scheme or artifice devised with (2) the specific intent to defraud, and (3) use of the United States mails or wires in furtherance thereof. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 782 (9th Cir. 2002 (citation omitted). Because the alleged predicate crime is based upon allegations of fraud, it must be pleaded with particularity. Fed. R. Civ. P. 9(b); *Odom v. Microsoft Corp.*, 486 F.3d 541, 553-54 (9th Cir. 2006).

Plaintiff does not specify when Defendant Beck committed mail and welfare fraud under the First Amended Complaint section entitled "Mail and Wire Fraud." (Dkt. 23, p.

**MEMORANDUM DECISION AND ORDER - 19**

34.) Thus, this allegation fails to meet the specificity requirements as to Defendant Beck. Plaintiff elsewhere in his pleading indicates that Beck violated his rights (not necessarily with mail or welfare fraud) in 2005 and January 2006. Even if these allegations were specific enough (and they are not), these dates are beyond the four-year statute limitations and cannot be pursued (discussed further below).

Similarly, Plaintiff alleges that Defendant McNutt committed mail and fraud between November 19, 2005, and December 12, 2005, by corresponding with him about his child custody, and that Defendant Jacobson committed wire fraud between November 13 and 16, 2005. for the same reason. (*Id*.) These acts do not show that these Defendants acted with intent to defraud, rather than negligence, or that the Defendants committed any criminal acts by corresponding with Plaintiff about his case in the manners stated in the First Amended Complaint. (*Id*.) In addition, these acts are beyond the statute of limitations and cannot be pursued.

Plaintiff alleges that in 2008, Defendant Cherly Buckner "constructively promised to give correspondence from Mr. Driggers to his daughters" and "constructively promised to monitor the children's care and send Reports to Plaintiff." (*Id*., p. 35.) Plaintiff asserts that, "[b]etween July 9 and 17, 2008, approximately, Cherly Buckner in knowing agreement and cooperation with the prior actors, violated 18 U.S.C. § 1341, the mail fraud statute by her actions in using the mail to send a ruse, to give Plaintiff a false impression." (*Id*., p. 36.)

**MEMORANDUM DECISION AND ORDER - 20**

Plaintiff has provided no plausible allegations whatsoever that Defendant Buckner's failure to give correspondence to the children or send reports to Driggers in prison resulted from an intent to defraud, rather than from negligence. Under the facts of this case, there is nothing showing that Buckner's correspondence with Plaintiff about his custody case, even if contained inaccuracies, was sent with specific intent to defraud Plaintiff. Accordingly, Plaintiff's allegations are insufficient to state a wire or mail fraud claim.

As to Defendant Glenda Felts, as noted in the Background section, above, the record before this Court reflects that, in 2009, Felts, and IDHW CPS supervisor, apparently did not do her part in effectuating the portion of the stipulated order permitting Plaintiff to have written contact with his children during his incarceration. However, Plaintiff has not adequately linked Ms. Felt's independent actions with any of the Defendants in this action.

Similarly, there are no allegations that Felts personally knew about the order in Plaintiff's case (which was addressed to a different case worker), that Plaintiff notified Ms. Felts about the court's order, or that Ms. Felts had any additional response if she were so notified. In any event, there are insufficient allegations showing that Ms. Felt's action in ignoring a court order that was not addressed to her was due to an intent to defraud rather than negligence or lack of notice, and, thus, Plaintiff has failed to state a mail fraud claim against her.

**MEMORANDUM DECISION AND ORDER - 21**

In *Silva v. Vittorio*, 658 F.3d 1090 (9th Cir. 2011), the United States Court of Appeals affirmed the federal district court's dismissal of a similar claim, where government workers were merely conducting the work of their employer:

> Here, we agree with the district court that Silva failed to state a claim under RICO and that any attempt to re-plead this claim would be futile. Silva's RICO allegations center on the WDOC's alleged transportation of him against his will from his prison in Washington to the FCC in Arizona. The predicate acts Silva alleges include "kidnapping," "witness tampering," mail fraud, and wire fraud—all of which relate to the allegedly illegal transport. Even if the Defendants' transfer of Silva from Washington to the FCC violated his constitutional rights to access the courts and to be free from retaliation, these acts do not qualify as predicate acts under § 1961(1), primarily because the Defendants broke no criminal laws when transporting Silva to the FCC. Not only does Silva's RICO claim fail to state a claim upon which relief may be granted, it is frivolous.

*Id*. at 1105-06. For the same reasons, Plaintiff's First Amendment Complaint fails to state mail or wire fraud claims against any Defendant that would qualify as predicate acts for a RICO claim.

Defendants further argue that Plaintiff has failed to allege facts showing that Defendants were engaged in acts that posed a threat of continued criminal activity. The Court agrees that, because Plaintiff has failed to allege acts showing that Defendants were engaged in individual criminal acts, he has not shown that the acts posed a threat of continued criminal activity.

### C.    *Intended Beneficiary of the Allegedly Wrongful Acts*

Plaintiff has also failed to show that Defendants personally benefitted from the acts alleged in the First Amended Complaint. One of Plaintiff's arguments is that Defendants

**MEMORANDUM DECISION AND ORDER - 22**

used their employers' legitimate government agencies–the Post Falls Police Department and the IDHW CPS unit–to engage in a criminal scheme. Governmental agencies can act in concert with private individuals to qualify as a RICO enterprise, *see United States v. Dischner*, 974 F.2d 1502, 1511 (9th Cir.1992) *(overruled on other grounds by United States v. Morales*, 108 F.3d 1031 (9th Cir.1997) (*en banc*); however, mere cooperation between agencies and local police in criminal investigations does not state a RICO or Hobbs Act claim. *See, e.g., Wilkie v. Robbins*, 551 U.S. 537, 566 (2007).

The distinguishing factor is whether the acts benefitted the government alone, or whether the acts benefitted the individual actors. *Id*. For example, in *Wilkie*, the Court noted that, "without some other indication from Congress, it is not reasonable to assume that the Hobbs Act (let alone RICO) was intended to expose all federal employees, whether in the Bureau of Land Management, the Internal Revenue Service, the Office of the Comptroller of the Currency (OCC), or any other agency, to extortion charges whenever they stretch in trying to enforce Government property claims." *Id*.

Here, there are no allegations that any Defendant obtained any personal gain from their alleged actions. As a result, no RICO or Hobbs Act claims lie. Whether Defendants were overzealous, careless, or both, the intended beneficiary of their actions was the City and State, which are the public guardians of the welfare of the citizens within its boundaries.

**MEMORANDUM DECISION AND ORDER - 23**

**D.**   *Concrete Financial Loss*

Defendants further argue that Plaintiff has not sufficiently alleged an injury to business or property to pursue a RICO claim. *Avalos v. Baca*, 596 F.3d 583, 592-93 (9th Cir. 2010). "Personal injuries" are not enough to state a RICO claim; rather, what is required is "a harm to a specific business or property interest." *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005). A court "must scrutinize the causal link between the RICO violation and the injury, identifying with precision both the nature of the violation and the cause of the injury to plaintiff." *Canyon County v. Synqenta Seeds, Inc*., 519 F.3d 969, 981 (9th Cir. 2008). The analysis of the injury element of RICO must include the following considerations:

> A "showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury" is insufficient to meet the requirement in § 1964(c) that the plaintiff's injury be "by reason of" the RICO violation. *Holmes*, 503 U.S. at 265-66, 112 S.Ct. 1311. Rather, a plaintiff must also show that the defendant's RICO violation proximately caused her injury. *Id*. at 268, 112 S.Ct. 1311. Proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id*.

*Canyon County*, 519 F.3d at 981.

Plaintiff's first allegation of injury to business or property is damage to the family and family relationships. (Dkt. 23, p. 2.)There is no legal precedent supporting the notion that a tort-style personal injury qualifies as an injury to business or property under RICO. *See Diaz*, 420 F.3d at 899-900.

**MEMORANDUM DECISION AND ORDER - 24**

Plaintiff also alleges that he lost part-time employment as an internet international currency exchanger, making $250 to $300 monthly, when Defendants took away all software, records, and hardware. (Dkt. 23, p. 3.) There are no allegations tying Defendants to the removal of Plaintiff's computer, and, thus, both "but for" and proximate causation are missing. Rather, here, Plaintiff alleges that Vassallo authorized the FBI to take his computer. Similarly, in his federal criminal case, Plaintiff asserted that the computer was taken by the FBI and retained by the United States government after trial. (Dkt. 135 in Case No. 2:06-cr-00173-EJL.) There are no plausible factual allegations linking Defendants to these damages.

Plaintiff also alleges that he lost $375 in social security disability payments and child support of $180 a month from Vassallo when he lost legal custody of the children. (Dkt. 23, p. 3.) He alleges, "By reason of the income coming out of the Plaintiff's custody of his children he had extra money to invest in Real Estate." (*Id.*, p. 4.) He alleges that he used this money to fund his business as a real estate investor/entrepreneur; but, "[w]hen the Defendants took all of his property, falsely charged him with misdemeanors and a felony, seized his children, [and] extorted him for money, all of these actions forced him to spend his profit and re-investment money in lawyers, and to pay the extortion demands." (*Id.*, p. 4.) He alleges that these actions "put [him] out of the Real Estate investing business, and basically pauperized him." (*Id.*)

It is implausible for Plaintiff to suggest that, because the children were removed from his home, causing him to lose their social security income and their child support, he necessarily "lost his business," because he no longer had "extra money "to invest in real estate. The money provided to him for the children was not, in fact, "extra money," but was money designated to pay for their food, shelter, and care. Once the children were not in his custody, he no longer had those expenses, and, thus, he had no entitlement to that "extra money." In any event, a parent has no ownership interest in a child's social security funds. *See Fuller v. Fuller*, 49 Ohio App. 2d 223, 358 (1976).

Plaintiff further alleges: "The actions of Defendants Buckner and Felts contributed to the theft of the Plaintiff's children and contributed to Plaintiff not being able, to this date, to rectify the theft through the State court system because they hid the mail and hid their intentions for months. (*Id.*, p. 4.) "Theft of children," liberally construed, refers to a personal injury not covered by RICO.

Finally, Plaintiff has not shown a sufficient proximate causal link between removal of personal property from his home in the amount of approximately $110,000 and Defendants' actions. Rather, Vassallo removed the property from his house, and Defendant police officers classified the issue as domestic and civil, and refused to recommend prosecution. Supporting the officers' position is Plaintiff's admission that he eventually obtain a judgment against Vassallo in a civil action.

**MEMORANDUM DECISION AND ORDER - 26**

Plaintiff further alleges that Defendants had a duty to prevent Vassallo from

removing the items from his house, where he and she had been residing, but Plaintiff

provides no factual or legal basis to support this allegation. Again, Plaintiff has not shown

a sufficient causal link between the loss and Defendants.

Defendants may have also given an opinion to Plaintiff's insurance company that it

was impossible for them to determine ownership of the property. However, this is still not

a proximate causal link to loss of the property.

### E. *Statute of Limitations*

RICO has a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff*

*& Assocs., Inc*., 483 U.S. 143, 156 (1987). In *Grimmett v. Brown*, 75 F.3d 506 (9th Cir.

1996), the United States Court of Appeals for the Ninth Circuit adopted the "injury

discovery" rule relied upon by the First, Second, Fourth, Fifth, and Seventh Circuits. This

"injury discovery" rule mandates that a civil RICO claim accrues "when a plaintiff knows

or should know of the injury that underlies his cause of action." *Id*. at 510. The "injury

discovery" rule has two components:

> [The first part is] [t]he plaintiff need not discover that the injury is
> part of a "pattern of racketeering" for the period to begin to run. The second
> part of the "injury discovery" rule is the "separate accrual rule," which
> provides that a new cause of action accrues for each new and independent
> injury, even if the RICO violation causing the injury happened more than
> four years before.

*Id*. at 510 (internal citations omitted). The "separate accrual rule" has been explained as

follows:

> The rule is that a cause of action accrues when new overt acts occur within the limitations period, even if a conspiracy was formed and other acts were committed outside the limitations period. A corollary rule is that damages may not be recovered for injuries sustained as a result of acts committed outside the limitations period.

*Id*. at 512 (internal citation omitted).

Plaintiff's Complaint was filed, at the earliest, on March 29, 2010 (mailbox rule),[6] and, at the latest, April 5, 2010 (actual filing date). Therefore, the injuries must have been sustained no earlier than March 29, 2006, for Plaintiff to proceed.

The only "business or property" injuries possibly attributable to Defendants are loss of the support and social security monies, which occurred shortly after the children were removed from his custody in 2005, and the taking of the personal property and computer, which occurred on February 6 or March 6, 2006, both of which occurred outside the four-year statute of limitations period.

Plaintiff makes several arguments in support of equitable tolling or estoppel. He alleges that he could not have brought this lawsuit earlier, because the personal property damages were part of a domestic relations matter. (Dkt. 23, p. 6.) Plaintiff alleges that he could not prove the property damage until Vassallo admitted the property was his in the domestic relations case. (*Id*.) Plaintiff's argument is unpersuasive. Nothing legally or factually prevented him from filing this action as soon as his property was taken; he could

---

[6] *See Houston v. Lack*, 487 U.S. 266 (1988) (in § 2254 context, a legal document is deemed filed on the date a prisoner delivers it to the prison authorities for filing by mail, rather than the date it is actually filed with the clerk of court; *Douglas v. Noelle*, 567 F.3d 1103 (9th Cir. 2009) (*Houston* applies to § 1983 filings).

**MEMORANDUM DECISION AND ORDER - 28**

have requested a stay of this action or the other action if both were proceeding simultaneously.

Plaintiff also alleges that extraordinary circumstances existed between August 2, 2006 and January 2008, because he was confined in the Bonner County Jail without access to a law library and because the prosecutor had possession of most of the documentary evidence needed for his pursuit of this case. (*Id.*)

Plaintiff does not show that he was actually impeded from filing a lawsuit, because he, in fact, filed a civil lawsuit against these same Defendants over virtually the same subject matter on October 26, 2007, in state district court, in Case No. CV-OC-2007-19469. (See http://www.idcourts.us/repository/case history.) Petitioner filed a civil lawsuit against Defendants in this Court, on March 5, 2008, *Driggers v. Health and Welfare, et al.*, in Case No. 2:08-cv-00116-BLW, and he filed a third lawsuit against them in 2009 in state court, in Case No. CV-OC-2009-11207. Therefore, Plaintiff's argument that he could not have filed the claims contained in this lawsuit within the four-year statute of limitations, is unpersuasive.

In addition, while it is true that the United States Attorney General may have been in possession of Plaintiff's family law records (*see* Dkt. 135, in Case No. 2:06-cr-00173-EJL), the Attorney General was ordered to return them to Plaintiff on November 26, 2007, well before Plaintiff filed this lawsuit in 2010. Further, the filing of Plaintiff's first state court case occurred in October 2007, belying his claims that he was unable to file a suit regarding the same subject matter without the records.

MEMORANDUM DECISION AND ORDER - 29

Plaintiff also alleges that he is entitled to equitable tolling because "clearly the Defendant actively took actions which constituted a protection to their own liability whether or not one may assume that was motive." (Dkt. 23, p. 6.) This allegation refers to the police officers' actions in refusing to charge Vassallo for the removal of Plaintiff's personal property, but, as noted above, the removal was eventually remedied in a civil, not a criminal action. Further, Plaintiff has not provided any factual allegations sufficiently linking Defendants to removal of the property, such that Defendants would have any liability for Vassallo's removal of the personal property, including that taken by the FBI. In addition, the totality of the records in Plaintiff's state and federal court cases does not reflect that Defendants attempted to prevent Plaintiff from filing a civil suit against them; in fact, Plaintiff has freely filed multiple lawsuits against these Defendants.

**2.      Hobbs Act**

Plaintiff's claims under the Hobbs Act, 18 U.S.C. § 1951 (either as a separate private civil cause of action or a predicate act under RICO) are subject to dismissal for failure to state plausible facts supporting such a claim.[7]

The Hobbs Act provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical

_____

[7] Because the Motion to Dismiss concerns only RICO, which may encompass the Hobbs Act, the Court will address the Hobbs Act claims here, rather than below as a part of the § 1915 screening of the remainder of the First Amended Complaint not covered by the Motion to Dismiss.

**MEMORANDUM DECISION AND ORDER - 30**

> violence to any person or property in furtherance of a plan or purpose to do
> anything in violation of this section shall be fined under this title or
> imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). Under this statute, the term "extortion" is defined as "the obtaining of

property from another, with his consent, induced by wrongful use of actual or threatened

force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

Plaintiff alleges that on December 12, 2005, Defendant McNutt, a CPS worker,

violated the Hobbs Act. The allegation supporting this claim is nearly incomprehensible:

"Defendant Christina McNutt, while in possession or control of Plaintiff Driggers'

children, with subjective bad faith insincerely promised immediate return of the children to

Mr. Driggers imposing under threat of official force the condition of Medicaid coverage

being obtained on the subject children by Plaintiff and legal custody to the State of Idaho

for purposes of taking classes, none of which was owed by Plaintiff to McNutt or to the

State." (Dkt. 23, p. 16.) The First Amended Complaint is without any allegations showing

that McNutt obtained property from Plaintiff or affected interstate commerce by doing her

job as a state welfare worker, however badly Plaintiff believes the job may have been

done.

Plaintiff further alleges that Defendant Amanda Grafe committed extortion and

violated the Hobbs Act by (1) "saying he would be denied his children until he met her

demands and performed a needless pretentious 'building of bridges' (as she phrased it) to

his own children" (Dkt. 23, p. 17); (2) refusing "to allow Mr. Driggers to have telephone

contact with his own children and requir[ing] Mr. Driggers to buy toys and other things

**MEMORANDUM DECISION AND ORDER - 31**

and deliver to her under threat of never seeing his children again." (*Id.*); and (3)

"declar[ing] to the State court in June 2006 that Mr. Driggers' children stated they thought

their Dad had a gun and would shoot them and thus should be kept from contact with

him." (*Id.*)

Plaintiff further argues that extortion occurred when Grafe, Vassallo, and others

made up the gun possession allegation, reasoning that "the children in November 2005 had

already been taken by CPS well before the gun issue arose in January 2006." (*Id.*) "Grafe

had control of the children thus any fear they expressed would be her fault," Plaintiff

argues. (*Id.*)

Because Plaintiff has not alleged how Grafe obtained "property" from him, affected

interstate commerce, or committed extortion by her suggestion that Plaintiff provide gifts

to his children while they were in State custody or her testimony in court about the family,

Plaintiff's allegations fail to state a claim upon which relief can be granted under the

Hobbs Act. *See, e.g., Scheidler v. National Organization for Women, Inc*., 537 U.S. 393,

405 (2003) ("Petitioners may have deprived or sought to deprive respondents of their

alleged property right of exclusive control of their business assets, but they did not

receive[] 'something of value from' respondents that they could exercise, transfer, or

sell.").

## OTHER DEFENDANTS AND OTHER CAUSES OF ACTION

While the Motion to Dismiss was filed by less than all of the named Defendants,

and Plaintiff appears to wish to proceed on claims beyond the RICO claims discussed in

**MEMORANDUM DECISION AND ORDER - 32**

the Motion to Dismiss, the Court nevertheless finds it appropriate to dismiss the entire

action against all Defendants, because it is clear that Plaintiff cannot state a claim against

any of the Defendants. *See* Title 28 U.S.C. § 1915(e)(2) (authorizing the Court to dismiss

an in forma pauperis complaint *at any time* if the claims appear subject to dismissal).

**1.      Defendant David Beck**

**A.      *Kidnaping***

There are no allegations plausibly suggesting that Officer Beck kidnaped Plaintiff's

minor children on November 18, 2005. (Dkt. 23, pp. 13-14.) Rather, Plaintiff's pleadings

and exhibits establish that the children were lawfully placed into State temporary custody.

Even if these allegations stated a claim, they are beyond the statute of limitations period,

whether as a RICO predicate act (four-year statue of limitations), or a civil rights claim

under 42 U.S.C. § 1983 or state tort cause of action for personal injury (two-year statutes

of limitations).

**B.      *Sexual Exploitation of Children***

Plaintiff alleges that David Beck subjected D.D. to a medical examination regarding

the sexual misconduct allegations without parental consent, and that such action was

unlawful because D.D. was not legally in the State's custody at that time. (Dkt. 23, p. 19.)

However, Plaintiff's own allegations show that the children were taken into the custody of

the State temporarily on November 18, 2005, and there is no evidence in the record

suggesting that Plaintiff or his wife regained custody prior to the medical examination of

D.D. on May 16, 2006. There is no factual basis for this claim. In addition, if intended to

**MEMORANDUM DECISION AND ORDER - 33**

be a civil rights claim or a pendent personal injury claim, it was filed beyond the two-year statute of limitations. Therefore, it is subject to dismissal.

C.   *False Arrest and False Charge*

Plaintiff alleges that, on June 22, 2006, Beck solicited the false arrest of Plaintiff based on a false charge that alleged Plaintiff committed lewd and lascivious conduct, being subjectively aware of the evidence available that indicated Plaintiff was innocent. Plaintiff alleges that the State refused to charge Plaintiff. (Dkt. 23, p.19.) Cutting against Plaintiff's factual allegation are the IDHW exhibits attached to the First Amendment Complaint that support the allegations of D.D. and her sisters that their father had inappropriate bodily contact with D.D. In any event, this claim was filed beyond the statute of limitations for both a civil rights and a state tort law claim, and cannot now be pursued.

**2.   Defendant Robin Jacobson**

The allegations against Robin Jacobson arise from a series of telephone calls between December 13, 2005, and December 16, 2005, and any "damages" arise from that period of time. These allegations are all beyond the statute of limitations period, whether construed as a RICO, civil rights, or state law tort claim. (Dkt. 23, p. 27.)

**3.   Defendant Kathy Crawford**

Between December 1, 2005, and March 30, 2006, Crawford acted as a personal counselor for Vassallo. Plaintiff alleges that Crawford "generally instructed and

**MEMORANDUM DECISION AND ORDER - 34**

encouraged [Vassallo] on how to go about things to act against Plaintiff and his rights and further encouraged her to motivate her to do so." (Dkt. 23, p. 28)

The allegations are too general to permit Plaintiff to proceed against Crawford. Plaintiff's allegations are based upon pure speculation, and, as such, are implausible: "During this time of visiting with Crawford, Karen caused me to be arrested and hauled off to a 2-week jail stay on a false gun charge. From knowing Karen–and others who know her in Phoenix–firmly believe that Karen was not capable of pulling off such a scheme by herself without some ideas from Crawford." (Dkt. 23-2, p. 3.) In addition, because the alleged advice from Crawford and any damages therefrom arose from the  January 2006 incident with the gun, the claim is beyond the four-year RICO statute of limitations period.

Because Plaintiff provides no allegations whatsoever regarding any of Crawford's acts between March 26, 2006, and March 30, 2006, that may have been within the RICO statute of limitation period, Plaintiff has failed to state a claim under RICO upon which relief can be granted against Crawford. Because the allegations about Crawford's advice arise from a time period more than two years prior to the filing of the original Complaint in this action, Plaintiff would also be unable to proceed under a § 1983 or state law tort theory.

**4.      Defendant Amanda Grafe**

Plaintiff alleges that Amanda Grafe presented a false affidavit or sworn statement in the parental rights termination hearing on May 23, 2007. The allegation is that Grafe said that Plaintiff was convicted of  "solicitation to commit murder" instead of "use of

**MEMORANDUM DECISION AND ORDER - 35**

interstate facilities in commission of murder-for-hire." (Dkt. 23, p. 30.) Plaintiff fails to show the import of this difference, or how it damaged him, because his rights were never terminated. In addition, this claim was filed beyond the two-year statute of limitations period if the claim is construed as a civil rights or state law tort claim. Therefore, he has failed to state a claim upon which relief can be granted.

**5.      Defendant Idaho Department of Health and Welfare**

In *Hans v. Louisiana*, 134 U.S. 1 (1890), the Supreme Court held that the Eleventh Amendment prohibits a federal court from entertaining a suit brought by a citizen against a state. The Supreme Court has consistently applied the Eleventh Amendment's jurisdictional bar to states and state entities "regardless of the nature of the relief sought." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Therefore, Plaintiff's claims against the IDHW are subject to dismissal on sovereign immunity grounds.

**6.      Defendant Post Falls Police Department**

To bring a § 1983 claim against a municipality (local governmental entity), a plaintiff must allege that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains. *Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658, 694 (1978). That is, "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

**MEMORANDUM DECISION AND ORDER - 36**

Requisite elements of a § 1983 policy-based claim against a municipality or entity are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy;[8] (3) the policy amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir.1996) (internal quotation marks omitted)).

Plaintiff has provided no plausible claims that would support a policy- or custom-based claim against the Post Falls City Police Department. Therefore, he cannot proceed.

## 7.   Clayton Act

Plaintiff also alleges that Defendants interfered with commerce and violated the Clayton Act, 15 U.S.C. § 26. Plaintiff alleges that his lost child support payments are a "thing" in interstate commerce, because they are paid by mail, wire or electronic transfer of funds. (Dkt 23, p. 36.)

The Clayton Act provides, in pertinent part, "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive

---

[8] "An official municipal policy" may include "decisions of a government's lawmakers, the acts of its policymaking officials, [or] practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).

**MEMORANDUM DECISION AND ORDER - 37**

relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings...."

Here, Plaintiff's facts do not support such a claim. The Clayton Act, codified at 15 U.S.C. §§ 12-27, was enacted in 1914 to amend the Sherman Antitrust Act. The Clayton Act "prohibits price discrimination, tying arrangements, and exclusive-dealing contracts, as well as mergers and interlocking directorates, if their effect might substantially lessen competition or create a monopoly in any line of commerce." *Black's Law Dictionary* (9th ed. 2009 online), Clayton Act.

Plaintiff's stretch to classify his loss of child support payments resulting from his loss of custody as an antitrust case falls short. Plaintiff's case is not analogous to or based on federal criminal statutes used for enforcement of child support payments, the Child Support Recovery Act of 1992 (CSRA)[9] and the Deadbeat Parents Punishment Act of 1998 (DPPA),[10] which have been found constitutional on grounds that a court-ordered child support payment is clearly a "thing" in interstate commerce, permitting exercise of Congress's Commerce Clause authority. Rather, Plaintiff's loss of child support payments arises from his loss of custody due to issues surrounding proper disciplining and care of his children, and then from his conviction and imprisonment for the crime of Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire, where the victim of the intended murder was the children's mother. That Ms. Vassallo's child support

---

[9] 18 U.S.C. § 228(a)(1).

[10] 18 U.S.C. § 228(a)(3).

**MEMORANDUM DECISION AND ORDER - 38**

payments to Plaintiff were stopped as a result of custody changes does not create an antitrust case, because no federal statute with attendant Commerce Clause authority exists to govern that circumstance. There is no legal basis for Plaintiff's claim that custody and support actions (not based on the federal criminal statutes set forth above) are transformed into antitrust actions because child support or social security payments are involved. *See United States v. Lewko*, 269 F.3d 64 (1st Cir. 2001).[11]

Most importantly, as to a Clayton Act claim, Plaintiff has not pointed to any acts of Defendants that would amount to any sort of price discrimination, tying arrangements, exclusive-dealing contracts, mergers or interlocking directorates, or other transactions that might substantially lessen competition or create a monopoly in any line of commerce. Indeed, Plaintiff's allegations are so far off the mark as to be frivolous. This claim will be dismissed.

## 8.   Unlawful Welfare Funds Receipt

Plaintiff alleges that Defendants "did enrich themselves with unlawful welfare

---

[11] The *Lewko* Court rejected the notion that these federal criminal child support enforcement statutes were an attempt to create "federal family law," reasoning:

Neither the CSRA nor the DPPA have either the purpose or effect of establishing a national, uniform "family law." They address neither the degree (*i.e.*, amount) nor duty of support owed (*i.e.*, when a duty of support shall be triggered or terminated). Rather, the provisions of these two acts are designed to protect the integrity of state court judgments, in light of the fact that parties attempting to enforce these court orders face significant difficulties when the non-paying party flees the ordering jurisdiction.

269 F.3d at 69.

**MEMORANDUM DECISION AND ORDER - 39**

funds payments, and with Social Security disability payments to which Plaintiff was otherwise entitled, and with Title VI payments, by exploiting the situation they entirely set up." (Dkt. 23, p. 20.) There are no factual allegations showing that Defendants obtained any monetary benefit from their actions. Therefore, this cause of action is subject to dismissal.

9.     **"Honest Services Fraud"**

Under the section in the First Amended Complaint entitled, "Honest Services Fraud," Plaintiff alleges that each Defendant "did violate their duty and trust." (Dkt. 23, p. 37.) Plaintiff refers to all of the previous allegations of the First Amended Complaint to support this claim. As noted above, Plaintiff has not pleaded any plausible facts supporting fraud. In addition, this is not a cognizable cause of action and is subject to dismissal. *See Brady v. Lynes*, 2008 WL 2276518 (S.D.N.Y. 2008).

## PLAINTIFF'S MOTIONS

Plaintiff has filed a Motion for Extension of Time to File Response to the Motion to Dismiss. (Dkt. 33.) Plaintiff's Response was filed on January 17, 2012. (Dkt. 38.) Good cause appearing, the Motion will be granted, and Plaintiff's Response has been considered.

Plaintiff also has filed a "Motion to Substitute by Adding Karen Vassallo as Party Defendant," pursuant to Federal Rule of Civil Procedure 20. (Dkt. 36.) He argues that "there is a certain logical connection between the alleged acts of Vassallo and the acts of the other listed Defendants," and "[i]t may also be helpful to all parties already listed to add Vassallo as a co-Defendant." (Dkt. 36, p. 1.) Plaintiff's claims will be dismissed for

**MEMORANDUM DECISION AND ORDER - 40**

failure to state a claim upon which relief can be granted. Further, Ms. Vassallo was not a state actor, nor did she conspire with state actors (because no plausible facts supporting a conspiracy exist), such that a federal civil rights claim would lie. For all of the reasons set forth above, Plaintiff cannot proceed against Ms. Vassallo.

Plaintiff has also filed a "Motion to Limit." (Dkt. 37.) He requests that the Court "limit any further mention to a trier-of-fact of Plaintiff Driggers' conviction and incarceration to the fact of his confinement, omitting any mention of the charge and conviction." (*Id.*, p. 1.) At this stage of proceedings, it is appropriate for the Court to take judicial notice of the records of Plaintiff's other related actions, so that the case can be properly screened, and the Motion to Dismiss adjudicated. If Plaintiff were proceeding to trial, his motion may be appropriate. As Plaintiff's case will be dismissed, the motion will be denied as moot.

## ORDER

**IT IS ORDERED:**

1.  Defendants' Motion to Dismiss (Dkt. 31) is GRANTED; the remainder of Plaintiff's case not covered by the Motion to Dismiss is subject to dismissal under the screening provisions of 28 U.S.C. § 1915 and 1915A.

2.  Plaintiff's Complaint and First Amendment Complaint are (Dkt. 3) DISMISSED with prejudice, as amendment would be futile.

3.  Plaintiff's Motion for Extension of Time to File Response to the Motion to Dismiss (Dkt. 33) is GRANTED. The Response (Dkt. 38) has been

considered.

4.      Plaintiff's Motion to Substitute by Adding Karen Vassallo as Party

Defendant (Dkt. 36) is DENIED.

5.      Plaintiff's Motion to Limit (Dkt. 37) is DENIED as MOOT.

DATED:  **August 28, 2012**

Honorable Edward J. Lodge
U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 42**